**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:**

**KORN FERRY (US),**
**a Delaware Corporation,**

        Plaintiff,

v.

**ELLEN WILSKER,  an individual,**

        Defendant.

_____

**KORN FERRY'S EX PARTE MOTION FOR TEMPORARY**
**RESTRAINING ORDER IN AID OF ARBITRATION, AND AN ORDER TO SHOW**
**CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE,**
**AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II.  PARTIES AND JURISDICTION ....................................................................... 2

III.  STATEMENT OF FACTS .................................................................................. 3

IV.  MEMORANDUM OF LAW .............................................................................. 9

    A.  A TEMPORARY RESTRAINING ORDER IS ESSENTIAL TO PREVENT IMMEDIATE INJURY...... 9

    B.  THE FACTS OF THE CASE SATISFY THE STANDARD FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION. ....................................................... 10

        1.  Korn Ferry is Likely to Succeed on the Merits. ........................................... 11
        2.  Korn Ferry will Suffer Irreparable Harm without Injunctive Relief. ...................... 17
        3.  The Balance of Equities Favors Korn Ferry. ............................................... 19
        4.  Issuance of Injunctive Relief is in the Public Interest. .................................... 20
        5.  A Nominal Bond is Sufficient to Secure the Injunctive Relief  Issued by the Court. ................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asness v. Nelson*,
   273 A.D.2d 165 (1st Dep't 2000) ...........................................................................11

*Ayco Co., L.P. v. Feldman*,
   2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ........................................................14

*BDO Seidman v. Hirshberg*,
   93 N.Y.2d 382 (1999) .......................................................................................10, 13

*BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs.,*
   *LLC*,
   425 F.3d 964 (11th Cir. 2005) ...............................................................................18

*Burk v. Augusta-Richmond County*,
   365 F.3d 1247 (11th Cir. 2004) .............................................................................16

*Bus. Intelligence Servs., Inc. v. Hudson*,
   580 F. Supp. 1068 (S.D.N.Y. 1984).......................................................................12

*Del Monte Fresh Produce Co. v. Dole Food Co.*,
   2001 U.S. Dist. LEXIS 8137 ..................................................................................16

*Delucca v. GGL Industries, Inc.*,
   712 So. 2d 1186 (Fla. 4th DCA 1998).....................................................................16

*Doe v. Bondi*,
   785 F. Supp. 3d 1268 (N.D. GA 2025)....................................................................10

*EarthWeb, Inc. v. Schlack*,
   71 F. Supp. 2d 299 (S.D.N.Y. 1999), aff'd 2000 U.S. App. LEXIS 11446,
   2000 WL 1093320 (2d Cir. May 18, 2000) ............................................................11

*Estee Lauder Cos. Inc. v. Batra*,
   430 F. Supp. 2d 158 (S.D.N.Y. 2006)................................................................11, 12

*Gatlin v. eCapital Freight Factoring Corp.*,
   2025 U.S. Dist. LEXIS 201282 (S.D. Fla. Apr. 13, 2025) ......................................17

*Hatfield v. AutoNation, Inc.*,
   939 So. 2d 155 (Fla. 4th DCA 2006).......................................................................15

*Hekimian Labs., Inc. v. Domain Sys., Inc.*,
   664 F. Supp. 493 (S.D. Fla. 1987) ..........................................................................10

i

*Hispanic Interest Coal. v. Governor of Ala.*,
  691 F.3d 1236 (11th Cir. 2012) ...................................................................................15

*Indep. Party of Fla. v. Sec'y, State of Fla.*,
  967 F.3d 1277 (11th Cir. 2020) ...................................................................................14

*Int'l Bus. Mach. Corp. v. de Freitas Lima*,
  Case No. 7:20-cv-04573 (PMH), 2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020)
  ......................................................................................................................10, 11, 12, 14

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
  No. 19-CV-7103, 2020 WL 1129773 (E.D.N.Y. Mar. 9, 2020)...............................12

*Maltby v. Harlow Meyer Savage, Inc.*,
  166 Misc.2d 481 (Sup. Ct. N.Y. Cnty. 1995) ...........................................................13

*Marsh USA Inc. v. Karasaki*,
  2008 U.S. Dist. LEXIS 90986 (S.D.N.Y. 2008).......................................................11

*MasterCard Int'l Inc. v. Nike, Inc.*,
  164 F. Supp. 3d 592 (S.D.N.Y. 2016)........................................................................12

*Miller Mechanical, Inc. v. Ruth*,
  300 So. 2d 11 (Fla. 1974)...........................................................................................15

*Natsource LLC v. Paribello*,
  151 F. Supp. 2d 465 (S.D.N.Y. 2001)..................................................................11, 13

*North Am. Products Corp. v. Moore*,
  196 F. Supp. 2d 1217 (M.D. Fla. 2002).....................................................................17

*Proudfoot Consulting Co. v. Gordon*,
  576 F.3d 1223 (11th Cir. 2009) ...................................................................................15

*Rochester Tel. Mobile Commc'ns, Inc. v. Auto Sound Sys., Inc.*,
  182 A.D.2d 1119 (4th Dep't 1992)..............................................................................11

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1223 (11th Cir. 2005) .....................................................................................9

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) ...................................................................................17

*Sethscot Collection, Inc. v. Walter Drbul*,
  669 So. 2d 1076 (Fla. 3rd DCA 1996)........................................................................16

*SVD Stars II, LLC v. United States*,
  138 Fed. Cl. 483 (Fed. Cl. 2018) ...................................................................................9

ii

*Swain v. Junior*,
     961 F.3d 1276 (11th Cir. 2020) ...........................................................................15

*Ticor Title Ins. Co. v. Cohen*,
     173 F.3d 63 (2d Cir. 1999)...................................................................................13

**Statutes**

28 U.S.C. § 1332...........................................................................................................2

P. 65, Fla. Stat. 682.031 ..............................................................................................1

Fla. Stat. §688.003 .................................................................................................1, 16

Fla. Stat. §688.003(1).................................................................................................16

**Other Authorities**

FED. R. CIV. P. 65(b)(1)(B)........................................................................................20

Federal Rules of Civil Procedure Rule 65(b).................................................................8

Rule 65(b)(1).................................................................................................................9

Rule 65(c).....................................................................................................................18

Concurrently with this action, Plaintiff Korn Ferry (US) ("Korn Ferry") has initiated an arbitration before JAMS against Defendant Ellen Wilsker ("Wilsker") arising out of Wilsker's breach of the restrictive covenants contained in her employment agreement with Korn Ferry. In aid of this arbitration, Korn Ferry hereby applies, on an *ex parte* basis, for entry of a temporary restraining order and an order to show why a preliminary injunction should not issue against Wilsker pursuant to the Fed. R. Civ. P. 65, Fla. Stat. 682.031, Fla. Stat. §688.003, and the Court's inherent equitable authority. In support thereof, Korn Ferry submits the following memorandum of law.

## I.     INTRODUCTION

This is an action to obtain a temporary restraining order and preliminary injunction pending resolution of an arbitration proceeding between the parties pursuant to the Employment Arbitration Rules of JAMS. A true copy of the arbitration agreement between Korn Ferry and Wilsker is here attached as Exhibit 1. Korn Ferry has filed an arbitration with JAMS concurrently with this action. Attached to this Motion are the Declarations of Tina McInstosh (the "McIntosh Decl.") [Exhibit 2], the Declaration of Dennis Dean (the "Dean Decl.") [Exhibit 3], and the Declaration of Daniel E. Vielleville (the "Vielleville Decl.") [Exhibit 4].

The facts are not complicated. This dispute arises from the resignation of Wilsker, a Senior Client Partner for Digital Talent Solutions at Korn Ferry. In direct violation of her contractual obligations and at great harm to Korn Ferry, Wilsker submitted her resignation from Korn Ferry, explaining that she was joining a competitor of Korn Ferry called Essenta. Wilsker intends to start this new employment notwithstanding that she contractually agreed not to work for a Korn Ferry competitor for a period of six months following her resignation during which time Korn Ferry would still be paying her salary.

To prevent continued irreparable harm arising from the breach described herein, Korn Ferry seeks an order in aid of arbitration temporarily restraining Wilsker from violating her employment agreement by working, or providing any services, to Essenta Partners ("Essenta"), until the 6-month period provided by her employment agreement expires on December 12, 2026, or until such time an arbitrator appointed by JAMS can address Korn Ferry's claims for permanent injunctive relief against Wilsker.

## II.       PARTIES AND JURISDICTION

1.       Korn Ferry is a Delaware corporation with principal place of business in Los Angeles, California. Korn Ferry maintains an office located at Coral Gables, Florida.

2.       Wilsker is an individual residing in Palm Beach County, Florida.  At all times relevant, Wilsker has worked remotely for Korn Ferry from her residence located in Boca Raton, Florida.

3.       This Court has personal jurisdiction over Wilsker because Wilsker is a resident of the State of Florida.

4.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Korn Ferry and Wilsker, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Plaintiff Korn Ferry is a Delaware corporation with a principal place of business in California. Defendant Wilsker is a citizen and domiciliary of the State of Florida.

5.       On June 19, 2026, Korn Ferry initiated a JAMS arbitration against Wilsker to enforce the covenants contained her employment agreement with Korn Ferry. Vielleville Decl. at ¶ 3

2

### III.        STATEMENT OF FACTS

6.        Korn Ferry is a global management and organizational consulting firm. It helps companies optimize their structure, evaluate and hire top talent, and design employee compensation, training, and development programs. Korn Ferry operates in over 50 countries. *See* Dean Decl. at ¶ 2.

7.        Korn Ferry maintains its market share by pouring significant time and investment into cultivating its customer relationships and bringing new customers to its platform.  Wilsker was an important component of Korn Ferry's growth efforts. McIntosh Decl. at ¶ 3.

8.        Among Korn Ferry's services and products are the Korn Ferry Talent Suite, an integrated, AI-enabled talent platform that brings together Korn Ferry's proprietary intellectual property, data, assessments, and HR technology into one connected experience. This tool helps clients to (a) identify current and future skill gaps, (b) select and develop high-impact talent, (c) align rewards to performance and potential, (d) improve commercial effectiveness, and (e) drive workforce agility at scale. The Talent Suite is integrated with a customer's overall human resources systems in order to maximize efficiencies in the management of the customer's overall working force. McIntosh Decl. at ¶ 2.

9.        Korn Ferry hired Wisker on December 7, 2020. Wilsker was hired initially as an Associate Client Partner for Digital Talent Solutions. Dean Decl. at ¶ 3.  At that time, Wilker executed a letter agreement setting forth the conditions and covenants of her employment with Korn Ferry. A true copy of her December 7, 2020 letter agreement is attached as Exhibit A to the Dean Decl.

10.        On April 30, 2023, Wilsker was promoted to Senior Client Partner for Digital Talent Solutions and held that position until her resignation effective June 12, 2026.  *Id.* at ¶ 4. As part of her promotion, Wilsker executed a letter agreement (the "Employment Agreement"). A true copy of the Employment Agreement is attached as Exhibit B to the Dean Decl.

3

11.     As a Senior Client Partner for Digital Talent Solutions, Wilsker was responsible for positioning the Korn Ferry Talent Suite and driving growth by identifying new prospects, converting them into clients, and expanding relationships within an identified portfolio of accounts. In addition to her overall responsibilities, Wilsker was actively working on deals and servicing Korn Ferry's clients located throughout the United States. McIntosh Decl. at ¶ 3.

12.     It could take Korn Ferry more than six months to negotiate and close new customer contracts. *Id.* at ¶ 4.

13.     Korn Ferry's product and service model means Wilsker could compete with Korn Ferry living and working from anywhere with an Internet connection. *Id.* at ¶ 5; Dean Decl. at ¶ 5.

14.     While employed at Korn Ferry, Wilsker used its resources to develop substantial goodwill and created personal relationships with Korn Ferry's customers, calling upon Korn Ferry's institutional knowledge and strategies to develop and foster relationships with customers. McIntosh Decl. at ¶ 5.

15.     Last fall, Korn Ferry hosted firmwide meetings called "We Are Korn Ferry" in Los Angeles where Korn Ferry North American consultants gathered for three days of programming. Wilsker attended the Financial Services session which took place October 22-24, 2025. The topics covered Korn Ferry cross-solutions groups, client use cases, capabilities and solution integration, Korn Ferry intellectual property, etc. A copy of the Program Agenda is attached Exhibit C to the Dean Decl. As these topics show, Wilsker's access to information about Korn Ferry's business and services was substantially broader than the Talent Suite itself as Wilsker was heavily involved in Korn Ferry's strategies for customer growth and cross-selling. Dean Decl. at ¶ 7-8, *see also* Exhibit C to the Dean Decl.

### Wilsker's Agreements

16.     As a condition of her engagement, Wilsker entered into multiple binding agreements with Korn Ferry, the Employment Agreement, the letter agreement dated November 13, 2020 and the Arbitration Agreement. The Employment Agreement imposed straightforward and unmistakable obligations: safeguard Korn Ferry's confidential information, refrain from

soliciting Korn Ferry's clients, and abide by a standard garden leave agreement for a period of six months following conclusion of her employment.

17.     The Arbitration Agreement created the obligations for Wilsker and Korn Ferry to submit any dispute against the other to arbitration under the auspices of JAMS. *See* Exhibit 1.

18.     Wilsker understood these obligations. She acknowledged them in writing. And upon the end of her engagement, she knowingly chose to violate them.

19.     Wilsker's Employment Agreement expressly prohibits her, for a two-year period immediately following the conclusion of her employment, without limitation, (1) to "solicit the business of any Client with respect to the rendition of Competitive Services", (2)  to "accept any assignment or engagement from any Client which involves Competitive Services"; or (3) to "recommend, encourage or induce any Client to cease its relationship with, or to stop using the services of, Korn Ferry" (the "Non-Soliciting Covenant"). *See* Exhibit B to the Dean Decl. at p. 3.

20.     Significantly, Wilsker's Employment Agreement**,** further includes an additional restriction (the "Garden Leave Covenant") as follows:

> [y]ou agree that during the term of your employment and for the six month period immediately subsequent to the expiration of your employment for any reason other than your involuntary termination without cause, you will not become an employee, independent contractor, manager or agent of any Competitor, where any part of your duties or responsibilities will involve the rendition or sale of Competitive Services within the geographic area in which you were employed by Korn Ferry, provided that Korn Ferry continues to pay you your then existing base salary during that six month time period.
> Exhibit B to the Dean Decl. at p. 3.

21.     This type of provision, commonly referred to as a garden leave, helps ensure an orderly transition of work and responsibilities in connection with employee departures and prevents the use of confidential business information for the benefit of the new employer.

22.     For Korn Ferry, the garden leave provisions included in contracts with all high-level personnel are particularly important because the 6-month period following an employee's resignation is the most critical time to protect Korn Ferry's client relationships and confidential

information. Therefore, Korn Ferry agrees to pay the employee's salary during this period to minimize the impact of the restriction on the employee. Dean Decl. at ¶ 14.

23.     The Employment Agreement defines "Competitive Services" as: "executive search, recruitment process outsourcing, recruiting, staffing, employee search, talent consulting strategy, organizational consulting and search, DE&I, compensation & total rewards consulting, workforce transformation including ESG, leadership development and coaching, and development of sales customer service and project management, digital products relating and/or the management of those activities for on behalf of other." *See* Exhibit B to the Dean Decl. at p. 3.

24.     The Employment Agreement further defines "Competitor" as: "any person, firm or entity, or any division, department or business unit of any person, firm or entity, rendering or providing in whole or in part any of the Competitive Services, either for its own account or the account of others." *See* Exhibit B to the Dean Decl. at p. 3.

25.     Finally, the Employment Agreement also includes a non-disclosure provision of Korn Ferry's trade secrets, confidential and proprietary information (the Non-Use and Non-Disclosure Covenant"). *See* Exhibit B to the Dean Decl. at p. 3.

### Wilsker's Departure

26.     On May 29, 2026, Wilsker informed her supervisor that she was resigning and had accepted a position with a boutique organization consulting company. McIntosh Decl. at ¶ 7. She subsequently informed Korn Ferry that she had accepted a position with Essenta Partners ("Essenta"). Dean Decl. at ¶ 10.

27.     Essenta is a British talent consulting firm with offices in New York and London. Essenta's services include executive interim, executive search and leadership advisory services, which include assessments, coaching and succession planning. *Id.* at ¶ 11.

28.     By letter dated June 1, 2026, Samantha Goodman, Associate General Counsel for Korn Ferry, advised Wilsker that, in accordance with the Garden Leave Covenant, Korn Ferry would continue pay Wilsker's base salary until December 12, 2026, and that Wilsker will be prohibited from working with a Competitor during that period. *See* Exhibit D to the Dean Decl. at

p. 1. Further, in this communication, Korn Ferry also confirmed Wilsker's Non-Soliciting Covenant and Non-Use and Non-Disclosure Covenant. *Id.*

29.     Between June 1 and 2, 2026, Wilsker inquired with Korn Ferry management how her Garden Leave Covenant will operate in practice and the type of benefits and incentives covered by it.

30.     On June 2, 2026, Korn Ferry provided a detailed explanation of the payments included in her Garden Leave Covenant.

31.     Dissatisfied with the response received from Korn Ferry management as to the coverage of the Garden Leave Covenant,  Wilsker, through her attorneys, has indicated that she does not intend to comply with the Garden Leave Covenant specifically. Dean Decl. at ¶ 16. Wilsker, also through her attorneys, has indicated that she plans to start working at Essenta on July 1, 2026.

32.     Significantly, Wilsker, through her attorneys, has indicated that her new position will involve "working on thought leadership and assisting in growing its non-executive / interim search business."  *Id.* at ¶ 17.

33.     Wilsker, through her attorneys, has further stated that her new job description represents no competition with Korn Ferry as she will not be involved with selling intellectual property similar to Korn Ferry's. *Id.* at ¶ 18.

34.     However, Wilsker's job description involves competition with Korn Ferry's products and services, even if Wilsker's job duties at Korn Ferry did not include recruitment, employee search or staffing. In fact, the definition of "Competitive Services" of the Employment Agreement includes "recruiting", "staffing" and "employee search", which clearly overlaps with Wilsker's "non-executive / interim search business" role at Essenta. *See* Exhibit B to the Dean Decl. at p. 4.

35.     The following chart illustrates the similarities between Essenta's products and services with those offered by Korn Ferry:

7

| Essenta[1]<br>What we do | Korn Ferry[2]<br>How Can We Help |
|---|---|
| "Executive Search:<br><br>The right talent can transform your business. We go further to help you find, attract and keep the leaders who'll help you meet your business goals." | "Executive Search:<br><br>We help you find leaders who fit your culture and advise you on the rewards that will encourage them to stick with you. Our executive search recruiters have experience around the world, in industries like finance, life sciences, consumer, healthcare, technology and beyond. Here's how we can help." |
| "Executive Interim:<br><br>We deliver rigorously vetted executive Interims at speed, leveraging deep industry expertise for critical leadership needs." | "Interim Executives & Professionals:<br><br>Interim executives and professionals drive the outcomes you need today and tomorrow. Top performers are increasingly defining when, where and how they work. Many are choosing interim to suit their lifestyle. From short to long term or unplanned to strategic, we have access to the highest quality in-demand talent to fit your needs." |
| "Leadership advisory:<br><br>We build high-performance leadership teams, combining data-driven insights with a deep understanding of each client's unique needs." | "Leadership and Professional Development:<br><br>Our programs ensure scalable, impactful growth by leveraging proven methodologies and innovative tools like data-driven Success Profiles™. Equip your leaders and teams with the skills, mindset, and tools to confidently face today's challenges and build for the future." |
| "Essenta Discovery Process®: | "Talent Suite:<br><br>Talent Suite is Korn Ferry's technology platform. It takes everything we know |

---

[1] https://essentapartners.com/what-we-do/.  Screenshots from Essenta's website are here attached as composite Exhibit E to the Dean Decl.

[2] https://www.kornferry.com/capabilities/talent-acquisition.  Screenshots from Korn Ferry's website are here attached as composite Exhibit F to the Dean Decl.

| | |
|---|---|
| Shape your most critical talent strategy with the unparallelled accuracy and scalability of our proprietary tool." | about people and makes it work inside your organization, ensuring every talent decision is connected, grounded in science, and aligned to the outcomes that matter most to your business.<br><br>Empower your people by making talent decisions quicker and more accurately with our Talent Platform." |

36.     A cursory review of the chart above demonstrates that, regardless of Wilsker's specific job description, Essenta offers Competitive Services comparative to Korn Ferry's. Accordingly, Essenta is a Competitor within the definition included in the Employment Agreement. *See also* Dean Decl. at ¶ 19.

37.     Furthermore, Wilsker's sudden departure from the Digital Talent Suite group has, and continues to cause, significant harm to Korn Ferry. McIntosh Decl. at ¶ 8.

38.     Wilsker clearly has breached or intends to breach the Garden Leave Covenant in her Employment Agreement, and her breach of the Garden Leave Covenant and her conduct described herein have caused and will continue to cause irreparable harm to Korn Ferry by destabilizing Korn Ferry's Digital Talent Suite group as well as the cross-selling of other products and services.  Moreover, it is highly likely that Wilsker-despite her statements to the contrary- has or will continue to use Korn Ferry's confidential and proprietary information to solicit customers she served while working at Korn Ferry.

39.     Prior to leaving her job at Korn Ferry, Wilsker downloaded some Korn Ferry business templates and a commissions report without any justification. Dean Decl. at ¶¶ 20-21.

**IV.      MEMORANDUM OF LAW**

**A.      A Temporary Restraining Order is Essential to Prevent Immediate Injury.**

Rule 65(b) of the Federal Rules of Civil Procedure provides, in part, that a temporary

9

restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." This is such a case.

As demonstrated in Section B below, Korn Ferry has established each of the four elements required for injunctive relief. The specific facts establishing immediate and irreparable injury are detailed therein and incorporated by reference. The additional requirement of Rule 65(b)(1), that the injury will result before the adverse party can be heard, is equally satisfied. Based on the statements of her own counsel, Wilsker is planning to start her new employment on July 1, 2026, she has stated that she will not abide by the Garden Leave Covenant, and explicitly threatened to return any payment made by Korn Ferry in compliance with the Employment Agreement. *See* Dean Decl. at ¶ 16. Hence, there is real risk that the harm caused by Wilsker's breach of the Employment Agreement cannot be undone before the JAMS arbitration could provide any meaningful relief.

Wilsker has been notified of the relief sought through counsel, but for the reasons set herein, the Court should not wait for Wilsker to respond before entering a Temporary Restraining Order.

### B.   The Facts of The Case Satisfy the Standard for Temporary Restraining Order and Preliminary Injunction.

The standards for determining whether to grant a temporary restraining order and for granting a motion for a preliminary injunction are aligned. In either case, the moving party must demonstrate that: (1) it is likely to ultimately succeed on the merits of its claims; (2) it will be irreparably harmed without injunctive relief; (3) the balance of hardships tips in its favor; and (4) the public interest favors the grant of injunctive relief. *SVD Stars II, LLC v. United States*, 138 Fed. Cl. 483, 486 (Fed. Cl. 2018). Korn Ferry's evidence establishes these elements.

10

1.      **<u>Korn Ferry is Likely to Succeed on the Merits.</u>**

To obtain a temporary restraining order or preliminary injunction, a party must establish a substantial likelihood of success on the merits. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005). A substantial likelihood of success on the merits does not require certainty of success but rather a showing that success is "likely or probable, rather than certain success." *Doe v. Bondi*, 785 F. Supp. 3d 1268, 1281 (N.D. GA 2025) (citing *Schiavo*, 403 F.3d at 1232).

Korn Ferry is likely to succeed on the merits of its breach of contract and permanent injunction claims. There is no doubt that Wilsker entered into the Garden Leave Covenant. *See* Exhibit B to the Dean Decl. at p. 4. It is also undisputed that Wilsker stated that she intends not to abide by the Garden Leave Covenant and will start her new position with Essenta -- a Korn Ferry competitor -- immediately. As shown in the chart above, *supra* at ¶ 35, Essenta's marketed services are almost identical to those offered by Korn Ferry.  The Court should immediately enter a temporary restraining order and set a hearing on the first available date, as required by the Federal Rules of Civil Procedure. Unless the Court immediately restrains Wilsker, Korn Ferry will suffer irreparable injury to its business.

a.      **<u>*Wilsker's Garden Leave Covenant Is Enforceable.*</u>**

The Employment Agreement contains a choice of law provision providing for the application of New York law. But the Garden Leave Covenant would be enforceable even if Florida law would apply. *Hekimian Labs., Inc. v. Domain Sys., Inc.,* 664 F. Supp. 493, 498 (S.D. Fla. 1987) (enforcing a non-compete where the employee received 50% of his salary during the restricted period). Restrictive covenants are enforceable by New York courts provided they (1) are reasonable in scope and duration, both geographically and temporally, (2) advance a legitimate economic interest of the party enforcing the covenant, and (3) survive a balance of the equities. *BDO Seidman*

11

*v. Hirshberg*, 93 N.Y.2d 382, 389 (1999).   *See also  Int'l Bus. Mach. Corp. v. de Freitas Lima*, Case No. 7:20-cv-04573 (PMH), 2020 WL 5261336  (S.D.N.Y. Sept. 3, 2020) (*aff'd International Business Machines Corporation v. Kede de Freitas Lima*, 822 Fed. Appx. 911 (2d Cir. 2021). Wilsker's Garden Leave Covenant is reasonable in both scope and duration.

### Reasonable Duration.

New York courts assessing the duration of a restrictive covenant "focus[] on the particular facts and circumstances giving context to the agreement." *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 179 (S.D.N.Y. 2006) (citing *BDO Seidman*, 93 N.Y.2d at 390). Generally, restrictions with durations of one year or less are found to be reasonable. *Int'l Bus. Mach. Corp. v. de Freitas Lima*, 2020 WL 5261336 at *19 (one year restriction reasonable); *Asness v. Nelson*, 273 A.D.2d 165 (1st Dep't 2000) (one year restriction was reasonable); *Rochester Tel. Mobile Commc'ns, Inc. v. Auto Sound Sys., Inc.*, 182 A.D.2d 1119 (4th Dep't 1992) (six month restriction was reasonable); *Marsh USA Inc. v. Karasaki*, 2008 U.S. Dist. LEXIS 90986 (S.D.N.Y. 2008) (one-year client based restriction without geographical limit found reasonable).

A six month non-compete is eminently reasonable in these circumstances. *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001). Korn Ferry maintains its market share by pouring significant time and investment into cultivating its customer relationships and bringing new customers to its platform.  Dean Decl. at ¶ 2, 4.  And it can take Korn Ferry more than six months to negotiate and close new customer contracts.  McIntosh Decl. at ¶ 4.  As a Senior Client Partner, Wilsker was directly involved in building and cultivating Korn Ferry's pipeline of current and future institutional clients and talent profile knowledge. *Id.* at ¶ 6.  If permitted to work for Essenta within six months of her separation, Wilsker will inevitably rely upon that knowledge of Korn Ferry's business and customer relationships to attract new customers away from Korn Ferry

12

and Essenta and to compete directly with Korn Ferry. *Id.* at ¶ 8. In fact, in similar situations involving account and sales executives, courts applying New York law routinely conclude six months restrictive covenants like Wilsker's are reasonable and enforceable. *Estee Lauder Co., Inc. v. Batra*, 430 F. Supp. 2d 158, 180-82 (S.D.N.Y. 2006) (reducing a 12-month paid non-compete period to five months).

Moreover, Wilsker expressly agreed that a 6-month garden leave provision was "necessary and not greater that what is required to protect the legitimate and valid business interest and goodwill of Korn Ferry." *See* Exhibit B to the Dean Decl. at p. 4.

### Reasonable Geography.

New York law condones broad geographic restrictions, up to and including non-competes with a global scope . . . when the relevant competitive market is equally broad or global. "[W]here an employer's business is conducted worldwide to a global customer base, 'the lack of a geographic restriction [in a restrictive covenant] is necessary.'" *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (citation omitted); *see*, *e.g.*, *Int'l Bus. Mach. Corp. v. de Freitas Lima*, 2020 WL 5261336 at *19; *Estee Lauder*, 430 F. Supp. 2d at 181 (worldwide scope reasonable given "international scope of Estee Lauder's business and the cosmetic industry"); *Bus. Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984) ("I find the worldwide scope of the noncompetition clause not unreasonable, given the international nature of BIS's business."). Such is the case here, where Korn Ferry's product and service model means Wilsker could compete with Korn Ferry living and working from anywhere with an Internet connection. Dean Decl. at ¶ 5. Korn Ferry has offices in both New York and London, the same cities where Essenta has offices. *Id.* at ¶ 11-12. It is more than appropriate that Wilsker be

13

prohibited from soliciting customers and competing on behalf of a competitor regardless of the geographic location.

**Protection of Korn Ferry's Legitimate Interests**.

Korn Ferry's interests here include protection of employer goodwill and protection of employer confidential information from misuse—both of which courts have found legitimate to enforce a non-compete. *Intertek Testing Servs., N.A., Inc. v. Pennisi*, No. 19-CV-7103, 2020 WL 1129773, at *22 (E.D.N.Y. Mar. 9, 2020) (legitimate interests include safeguarding the goodwill and relationships of clients and customers and maintaining trade secrets and confidential information, including client contacts and pricing information, from unfair competition). While employed at Korn Ferry, Wilsker used Korn Ferry's resources to develop substantial goodwill and created personal relationships with Korn Ferry's customers, calling upon Korn Ferry's institutional knowledge and strategies to develop and foster relationships with customers. McIntosh Decl. at ¶ 6. *BDO Seidman*, 93 N.Y.2d at 392; *see also Maltby v. Harlow Meyer Savage, Inc.*, 166 Misc.2d 481, 486 (Sup. Ct. N.Y. Cnty. 1995) (granting preliminary injunction where former employees had "unique relationships with the customers with whom they ha[d] been dealing that ha[d] been developed" while working for former employer "and, partially, at [former employer's] expense"). Those strategies are reflected in Korn Ferry's confidential documents, including its client lists, customer databases, and Korn Ferry's sensitive and trade secret Talent Suite. McIntosh Decl. at ¶ 2. Wilsker also acquired detailed knowledge of Korn Ferry's customer development strategies. *Id.* at ¶ 3. And through her interactions with customers it is to be assumed that she developed an intimate understanding, on Korn Ferry's behalf, of Korn Ferry's customer needs and satisfactions—all of which are reasonably protected by the Garden Leave Covenant Wilsker freely agreed to.

14

Furthermore, Wilsker's departure from the Digital Talent Suite group has, and continues to cause, significant harm to Korn Ferry and will cause further harm if she is permitted to immediately begin competing with Korn Ferry at Essenta. McIntosh Decl. at ¶ 8. To that end, Korn Ferry has included the Garden Leave Covenant to protect itself and minimize the impact of the departure of a valuable employee as Wilsker and her immediate commencement of employment at a Competitor. Hence, Korn Ferry has a legitimate business concern in enforcing the Garden Leave Agreement.

Significantly, Wilsker expressly acknowledged that in the event of her breach of the Employment Agreement, the restrictive covenants contained therein "(1) are materials terms of this agreement and shall be enforced to the fullest extent of the law, (2) are reasonably necessary and not greater than what is required to protect the legitimate and valid business interests and goodwill of Korn Ferry; (3) are reasonably necessary to prevent unfair competition; (4) are reasonably limited in scope and duration; (5) do not impose undue hardship on you [Wilsker]; and (6) are not injurious to the public." *See* Exhibit B to Dean Decl. at p. 4.

Finally, the facts show that, if Wilsker is permitted to work for Essenta, Wilsker will inevitably (if inadvertently) use and/or disclose Korn Ferry's trade secrets and/or confidential information for her own benefit and for the benefit of Essenta.  It will be impossible for her to fulfill the duties of her role at Essenta without using or divulging Korn Ferry's trade secrets and/or confidential information.  Korn Ferry and Essenta are direct competitors providing the same products or services. *See supra* at ¶ 35.  Wilsker's new position is, on information and belief, directly involved in selling and managing services that are nearly identical to services that Korn Ferry provides such that she could not reasonably be expected to fulfill her new job responsibilities without utilizing Korn Ferry's trade secrets and/or confidential information. *See supra* at ¶ 35. The

15

trade secrets and confidential information in Wilsker's possession are highly valuable to both Korn Ferry and Essenta, particularly given the fast-moving, cutting edge, and highly competitive recruiting, interim and leadership advisory industry.

**The Equities Favor Korn Ferry.**

Finally, Korn Ferry's legitimate, strong interest in protecting its goodwill and confidential information outweigh Wilsker's interest in working for Essenta during the six months immediately following her resignation from Korn Ferry. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[i]f the unique services of [an] employee are available to a competitor, the employer obviously suffers irreparable harm"); *see also Natsource*, 151 F. Supp. 2d at 469 (an employer plaintiff will suffer irreparable harm if a defendant employee breaching a 120-day non-compete clause "is allowed to immediately work for a competitor, or otherwise solicit these customers, [as] these customers are likely to follow him because of their unique relationship," thereby depriving the plaintiff of the benefit of its bargain"). Given that the balance of equities favors the party seeking to preserve the status quo,  Wilsker's extensive knowledge of Korn Ferry's confidential information would make her competition with Korn Ferry's business particularly effective and unfair. This conclusion is particularly evident from the comparison between Essenta's and Korn Ferry's products and services. *See supra* at ¶ 33.

Korn Ferry does not seek to impose undue hardship on Wilsker. Continued consideration, although not dispositive, is an important consideration in the determination of whether the covenant as a whole is reasonable. *Int'l Bus. Mach. Corp. v. de Freitas Lima*, 2020 WL 5261336 at *18. Here, Korn Ferry has informed Wilsker that it will continue to pay her $123,750 in salary during the six-month Garden Leave period. Dean Decl. at ¶ 4, 22; *see also* Exhibit D to the Dean Decl.

b.        *Wilsker Has Breached And Will Continue To Breach Her Non-Compete.*

By working for Essenta, immediately after leaving Korn Ferry, Wilsker is or will be blatantly participating, directly or indirectly, in any capacity, in a business activity that is in direct competition with Korn Ferry less than six months after her separation, in breach of her Employment Agreement.

To Korn Ferry's knowledge, Wilsker accepted and will start her new job at Essenta on July 1, 2026, performing competing business functions to those of Korn Ferry. Dean Decl. at ¶ 17-19. Again, as stated above (*supra* at ¶ 35), Essenta is Korn Ferry's direct competitor and offers many identical products and services. Compare Exhibit E, with Exhibit F to Dean Decl.; *see also* Dean Decl. at ¶¶ 2, 11. Moreover, Wilsker's services at Korn Ferry are unique in that she engaged and developed client relationships and developed and learned numerous methodologies developed by Korn Ferry to cross-sale Korn Ferry's integrated products and services. *See Ayco Co., L.P. v. Feldman*, 2010 WL 4286154, at *10 (N.D.N.Y. Oct. 22, 2010) ("Where, as here, a financial services employee breaching a non-compete provision is engaged in developing and maintaining client relationships on behalf of his or her employer, and those relationships are cultivated, in part, through the employer's resources, that employee's services are generally deemed "unique.")

### 2.        Korn Ferry will Suffer Irreparable Harm without Injunctive Relief.

A movant seeking preliminary injunctive relief in the Eleventh Circuit must prove, among other elements, that it will suffer irreparable injury absent an injunction. *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020). The Eleventh Circuit frames the inquiry as whether irreparable injury will be suffered unless the injunction issues, not whether the movant has shown a generalized risk of harm in the abstract. *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020). Irreparable harm, in turn, is harm that cannot be remedied by money damages such as

17

an injury is irreparable when it cannot be undone through monetary remedies. *Hispanic Interest Coal. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012). *See also Miller Mechanical, Inc. v. Ruth*, 300 So. 2d 11, 12 (Fla. 1974) (internal citations omitted) (explaining that in cases of a breach of agreements not to compete, injunctions are generally granted because the task of determining damages caused by the breach is inherently difficult); *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 158 (Fla. 4th DCA 2006).

Korn Ferry faces clear, cognizable, and irreparable harm if Wilsker's unlawful misbehavior is not immediately enjoined.  McIntosh Decl. at ¶ 8. It is clear that Wilsker would give Essenta a competitive advantage which would not be compensable via monetary damages.

*Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1236 (11th Cir. 2009), addressed a restrictive covenant that contained both a noncompete clause and a prohibition against use or disclosure of confidential information. *Proudfoot* clarified the two approaches as follows:

> Under the approach adopted by the district court, such [restrictive] covenants should be enforced where an employee is in a position at her new employer to use her former employer's confidential information. Other authorities suggest a second, slightly different standard that would enforce such covenants where it is established that disclosure of the confidential information by the employee would be inevitable in the employee's new position.
> *Id.* at no. 12.

The Eleventh Circuit affirmed the district court's grant of the injunction. The district and appellate courts in *Proudfoot* followed the first approach that the employee's access to confidential information, which included the former employer's strategic plan, market analyses, forecasts, sales trends, and best practices, justified a restriction against work for a competitor where the employee was in a position at his new employer to use that information to unfairly compete against the former employer. Wilsker is in a similar situation here.

The disclosure of Korn Ferry's confidential information and trade secrets to a competitor

18

is also necessarily irreparable. Florida Statute §688.003, governing the misappropriation of trade secrets, provides for injunctive relief.  The Florida Statute states that "actual or threatened misappropriation [of trade secrets] may be enjoined." Fla. Stat. §688.003(1);  *Del Monte Fresh Produce Co. v. Dole Food Co.*, 2001 U.S. Dist. LEXIS 8137, 22 (allowing the use the inevitable disclosure doctrine to preclude employment with a competitor.) If not enjoined, Wilsker would inevitably bring to bear her in-depth understanding of the strengths and weaknesses of Korn Ferry's products, and her knowledge of Korn Ferry's customers and their deal terms, resulting in an unfair competitive advantage for Essenta. Dean Decl. at ¶ 20-21.  *See Sethscot Collection, Inc. v. Walter Drbul*, 669 So. 2d 1076, 1078 (Fla. 3rd DCA 1996) (holding confidential customer list with purchasing history is a trade secret); *Delucca v. GGL Industries, Inc.*, 712 So. 2d 1186, 1187 (Fla. 4th DCA 1998) (holding information about customers which is not available from other sources constitutes trade secrets under Chapter 688). This unfair competitive advantage is easily verifiable from a comparison between Essenta's marketed products and services and those offered by Korn Ferry. *See supra* at ¶ 35. There is no selective amnesia Wilsker can induce to suddenly forget the proprietary information and trade secrets Korn Ferry shared with her.  And there is no way for Wilsker to perform her duties at Essenta without using that same Korn Ferry information.

### 3.    <u>The Balance of Equities Favors Korn Ferry.</u>

The third element to obtain injunctive relief is that "the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party" - the balance of equities (or balancing of harms) requirement. *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1262 (11th Cir. 2004). Stated differently, the court considers whether the harm the applicant is likely to suffer without an injunction outweighs the harm the opponent is likely to suffer if an injunction is issued. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).

Again, Korn Ferry has tried for weeks to reach a resolution with Wilsker that would eliminate the need for preliminary injunctive relief. Wilsker has rejected all of Korn Ferry's attempts to reach a mutually satisfactory resolution.  Any purported harm Wilsker now faces from an injunction prohibiting her from working at Essenta is a result of her own decision to leave Korn Ferry to work for a competitor, not a result of any injunctive relief granted by this Court.  And any frustration of Wilsker's plans to immediately compete with Korn Ferry or slight inconvenience to her desired career trajectory with Essenta is far outweighed by Korn Ferry's need to protect its legitimate business interests.

The balance of equities does not rest on the harm comparison alone.  Wilsker did not arrive at this dispute as a party wronged by her employer. Wilsker arrived as the party who voluntarily resigned from her position with Korn Ferry with an immediate offer by a competitor employer and with the clear intention of not abiding by the covenants included in her Employment Agreement with Korn Ferry. Dean Decl. at ¶ 9, 16.  Wilsker is not an employee seeking to protect a legitimate interest in securing a job nor is she left unable to work and without compensation. Pursuant to the terms of the Garden Leave Covenant, Wilsker is being paid her very generous salary for the 6-month duration of her restrictive covenant – a total of $123,750 over six months – as compensation for complying with the non-compete. Dean Decl. at ¶ 4, 22. The balance of equities does not merely favor Korn Ferry; it compels the relief sought.

### 4.      Issuance of Injunctive Relief is in the Public Interest.

The fourth and final element requires Korn Ferry to establish that entry of the relief would serve the public interest. It does. "The public interest is generally advanced by enforcing valid contracts." *Gatlin v. eCapital Freight Factoring Corp.*, 2025 U.S. Dist. LEXIS 201282, at \*7 (S.D. Fla. Apr. 13, 2025); *see also North Am. Products Corp. v. Moore*, 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002) ("Under Florida law, the public has an interest in the enforcement of restrictive covenants.") The injunction Korn Ferry seeks does exactly that, it preserves the parties' contractual

relationship and enforces the plain terms of the Employment Agreement while the JAMS arbitrator resolves the underlying dispute on the merits. Korn Ferry seeks only to require Wilsker to abide by the reasonable restrictions to which she agreed in exchange for valuable consideration.

The public interest is further served by maintaining the status quo here, where Korn Ferry is paying in full every month Wilsker's salary, and asking only for the opportunity to be heard before Wilsker causes permanent and irreparable harm to its business.

**5. A Nominal Bond is Sufficient to Secure the Injunctive Relief Issued by the Court.**

Rule 65(c) gives courts wide discretion to set the bond amount, and even to dispense with any bond requirement. Fed. R. Civ. P. 65(c); *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well established that the amount of security required by the rule is a matter within the discretion of the trial court . . . [and] the court may elect to require no security at all.").

Because of the strong and unequivocal nature of Korn Ferry's evidence, including Wilsker's own written admissions confirming that she will not abide by the Garden Leave Covenant and intends to reject payment of her salary during the 6-month restrictive period, Korn Ferry respectfully requests that this Court require a bond of no more than $5,000.00. A bond in such an amount is fair and reasonable under the circumstances presented here and is consistent with bonds required by courts in this District in cases where the movant's evidence is strong and the risk of harm to the restrained party is minimal. Moreover, as detailed above and supported by the Demand for Arbitration, Wilsker will suffer no cognizable harm from the issuance of this relief. Wilsker is to be paid her base salary in full every month throughout the pendency of this proceeding. Dean Decl. at ¶ 22. Under these circumstances a nominal bond is not only appropriate but compelled by the equities.

WHEREFORE, Korn Ferry respectfully requests this Court grant a Temporary Restraining Order and, after hearing, a Preliminary Injunction:

21

22

1) Directing that until the expiration of the 6-month period in Wilsker's Employment Agreement or until such date as may be determined by an arbitrator appointed by JAMS, Wilsker be enjoined and restrained from violating the terms of her Employment Agreement by working for, or providing any services to, Essenta, any of its affiliates companies or any other competitor;

2) Wilsker is ordered to accept the garden leave compensation that Korn Ferry provides to Wilsker until December 12, 2026;

3) Should Wilsker refuse to accept or return the payments provided in the Garden Leave Covenant, that Korn Ferry be ordered to make payment by court registry with the Clerk's office;

4) Directing Wilsker to show cause why a Preliminary Injunction should not issue on the same terms;

5) Setting a bond in an amount no greater than $5,000.00; and

6) Granting such other and further relief as this Court deems just and proper.

## CERTIFICATION OF COUNSEL PURSUANT TO FED. R. CIV. P. 65(b)(1)(B)

Undersigned counsel conferred with Pennsylvania counsel for Wilsker regarding the relief sought herein. However, Wilsker refused to withdraw and recant her position with respect to the Garden Leave Covenant. Counsel for Wilsker indicated his firm will represent Wilsker with respect to this motion.

Wilsker and her counsel have been notified of the relief sought herein and will be served with this motion.

Dated: June 24, 2026

Respectfully submitted,

**SEYFARTH SHAW LLP**
441 Bianca Avenue,
Miami, FL
Telephone: (305) 786-0750
Facsimile: (786) 513-3301
By: /s/. *Daniel E. Vielleville*
Daniel E. Vielleville (FBN 940496)
dvielleville@seyfarth.com

*Attorneys for Plaintiff, Korn Ferry*

23